# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| ALLEN ALDRIDGE, )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>CARGILL INCORPORATED, )<br>    Defendant. ) | Cause No.: 2:12-CV-424-PRC |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 23], filed on October 1, 2013, by Defendant Cargill Incorporated ("Cargill").This is a personal injury case stemming from a back injury Plaintiff Allen Aldridge ("Aldridge") allegedly sustained while working at a Cargill plant in Hammond, Indiana. Aldridge filed a Complaint against Cargill in Lake County, Indiana, state court on August 27, 2012. Cargill removed this case to the United States District Court for the Northern District of Indiana on October 18, 2012, filing its Answer on the same day.

On October 1, 2013, Cargill filed the instant Motion for Summary Judgment along with related briefing and evidence. This matter became fully briefed on December 13, 2013. At issue here is whether Cargill owed Aldridge a duty of care, either under a contract Cargill entered into with Aldridge's erstwhile employer, KM Plant Services (KM), or by implication, based on Cargill's conduct.

Both parties consented orally to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 29 U.S.C. § 636(c).

# I. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254,

1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110–111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not

to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249–50.

### III. Material Facts

### A. The Injury

For many years, KM has provided a variety of services to Cargill on site at Cargill's Hammond, Indiana, plant. On the morning of January 17, 2011, Aldridge, who was a KM employee at that time, reported to KM's trailer located on the premises of the Cargill plant to pick up the day's work assignments from Travis Fowler, his supervisor. Fowler sent Aldridge to obtain a work assignment from a Cargill supervisor, who asked Aldridge to help clear a room filled with filing cabinets, refrigerators, garbage, and a very heavy laboratory stove, which Aldridge estimated to weigh about 350–400 pounds and to be about three feet in height, width, and length.

Before Aldridge and a coworker attempted to move the stove, he repeatedly asked the Cargill supervisor for a dolly. She told him that no equipment was available and that they had to get the stove out of the building and into a dumpster now. When asked about this interaction in his deposition, Aldridge denied that she had told him how to move the stove, explaining that she only directed him to the items that needed to be moved. Aldridge did not ask KM for a dolly or other equipment because on prior occasions he had been told specifically by KM to ask Cargill for equipment. Aldridge and other KM employees had used Cargill equipment on many other occasions. Of the great variety of equipment (e.g. forklift trucks and bobcats) and safety gear (e.g. eye protection and ear plugs) used by KM employees, including by Aldridge, only the trucks actually belonged to KM. Cargill, however, did not provide Aldridge with any safety training or oversight.

4

Aldridge and his coworker picked up the stove without the aid of any equipment. They carried it down a long flight of stairs and loaded it into a truck. They then drove somewhere between 50 and 100 yards to a dumpster, got out, and heaved the stove over the seven-foot-tall dumpster wall. Though he felt his back hurt when he first lifted the stove, it was his pushing the stove over the dumpster wall that injured him.

Thinking that it was only a strained muscle, Aldridge went home as ususal. When he woke up the next day, however, he found himself in great pain. He called his supervisor, Fowler, and told him that his back was badly hurt. Medical examination revealed that he had herniated a disc in his back. Aldridge underwent two surgeries. These helped, but he still suffers intense pain and is unable to do manual labor or lift much of anything.

### B. The Master Services Agreement

At all times relevant to this lawsuit, the relationship between Cargill and KM was governed by a contract titled Master Services Agreement ("the MSA"). The MSA sets out the services to be provided by KM and the terms and conditions by which KM was to abide.

The Court forgoes a lengthy quotation of the MSA. Rather, those looking for the exact language of the contract are directed to the appendix attached to this Opinion and Order where the relevant portions are reproduced in full. Summarized, relevant provisions of the MSA provide the following. Paragraph two of a section of the MSA titled "Appendix B" states that KM will be solely responsible for all means, methods, techniques, and procedures of any work performed by KM. Paragraph four states KM will pay for all tools and equipment necessary for completion of the work. Paragraph six declares that KM is responsible for complying with all laws and regulations related to employee health and safety. Paragraph seven declares that KM is an independent contractor, that

5

KM employees are not employees or agents of Cargill, and that KM has exclusive control and direction of its own employees. Paragraph eleven requires KM to be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with performance of the MSA. It requires KM to guard against injury or loss to persons working for KM and Cargill. KM is also required to erect and maintain reasonable safeguards for safety and protection and must designate a member of its staff to prevent accidents. KM is also required to promulgate safety regulations and must conduct safety inspections at least once per day. Finally, paragraph twelve generally discourages the use of Cargill equipment by KM employees.

Also relevant is a paragraph in Appendix A-1 of the MSA, entitled "Description of Services," which lists the type of services KM will provide. These include hydro blasting, industrial vacuum services, hot and cold water pressure washing, shuttle truck service in plant, lawn and ground maintenance, tank cleaning, snow removal, general labor (as directed by plant personnel), and sandblasting.

## IV. Analysis

Cargill seeks summary judgment on Aldridge's state-law negligence claim. To prevail on a negligence claim, a plaintiff must show that the defendant owed him a duty, that the Defendant breached that duty, and that the breach proximately caused the injury. *FSF Presidential Estates v. Grounds*, 997 N.E.2d 372, 374 (Ind. Ct. App. 2013) (citing *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind. Ct. App. 2004)).

Cargill's central contention is that it did not owe Aldridge any duty as a matter of law. While it is rarely appropriate to dispose of negligence cases on summary judgment, *see, e.g.*, *Downey v. Union Pac. R.R.*, 411 F. Supp. 2d 977, 981 (N.D. Ind. 2006), "whether a defendant owes a duty of

care to a plaintiff is a question of law for the court to decide." *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003) (citing of *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind. 1992)). This principle holds true when the question is whether "the duty to exercise care is governed by the relationship of the parties." *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1263 (Ind. Ct. App. 2002) (citations omitted).

Aldridge contends that a duty of care was created explicitly by the MSA and that Cargill's actions—specifically, Cargill's allowing KM employees, including Aldrige, to use Cargill equipment at the job site—created a duty by conduct.

## A. Duty by Contract

Both parties agree that there "can be no doubt that the duties performed by Aldridge for Cargill were governed by the MSA." Def. Resp. 5. In determining whether a contract creates a duty, a court must "ascertain the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties." *Id.* (citing *Teitge v. Remy Const. Co., Inc.*, 526 N.E.2d 1008, 1010–11 (Ind. Ct. App. 1988)). This is determined by the contract as a whole. *Id.* (citing *Hale v. R.R. Donnelley & Sons*, 729 N.E.2d 1025, 1028 (Ind. Ct. App. 2000)). The court's interpretation must harmonize the various provisions, *Id.* (citing *Teitge*, 526 N.E.2d at 1010), and must ascertain the meaning from consideration of every part, *Id.* (citing *Hale*, 729 N.E.2d at 1028), not merely from individual words, phrases, or paragraphs read in isolation. *Evansville-Vanderburgh Sch. Corp. v. Moll*, 344 N.E.2d 831, 837 (1976). If the contract affirmatively evinces an intent to assume a duty of care, actionable negligence may be available. *Merrill*, 771 N.E.2d at 1268 (citing *Hale*, 729 N.E.2d at 1028).

Examination of the MSA reveals numerous paragraphs dedicated particularly to the allocation or responsibility for safety and oversight. For example, paragraph two states that KM will be solely responsible for all the means, methods, techniques, and procedures of any work performed by KM. Paragraph four states KM will pay for all tools and equipment necessary for completion of the work. Paragraph six declares that KM is responsible for complying with all laws and regulations related to employee health and safety. Paragraph seven declares that KM is an independent contractor, that KM employees are not employees or agents of Cargill, and that KM has exclusive control and direction of its own employees. Paragraph eleven requires KM to be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with performance of the MSA. It requires KM to guard against injury or loss to persons working for KM and Cargill. KM is also required to erect and maintain reasonable safeguards for safety and protection and must designate a member of its staff to prevent accidents. KM is also required to promulgate safety regulations and must conduct safety inspections at least once per day. Finally, paragraph twelve generally discourages the use of Cargill equipment by KM employees.

Aldridge admits all this, but points out that the MSA provides that there will likely be occasions where KM employees use Cargill equipment to do their work and, in the paragraph entitled "description of services," that Cargill personnel will direct general labor done by KM employees. Aldridge contends that, along with the authority to direct, comes a duty of care owed by Cargill to Aldridge to make sure that the labor Cargill directed him to perform was done in a safe manner.

Far from harmonizing the provisions of the MSA, however, Aldridge's interpretation wrenches from its context one part of the contract—a part that does not have anything to do with

8

standards of care—and pits it against the rest. This will not do. *Merrill*, 771 N.E.2d 1258, 1268 (Ind. Ct. App. 2002) (citing *Teitge*, 526 N.E.2d at 1010) ("We accept an interpretation of the contract that harmonizes its provisions."). The Court accordingly finds that Cargill did not owe Aldridge any duty of care under the "description of services" paragraph of the contract.

Aldridge contends, alternatively, that whether a duty exists is a mixed question of law and fact that should not be resolved on summary judgment. *Helmchen v. White Hen Pantry, Inc.*, 685 N.E.2d 180, 181 (Ind. Ct. App. 1997). As explained above, whether a duty exists is usually a question of law, and Aldridge provides no reason why that general rule does not apply here. *Id.* And insofar as Cargill's actions bear on the existence of a duty between it and Aldridge, that issue belongs to the analysis of duty by conduct, considered below. Thus, the Court finds that Cargill did not owe Aldridge any duty of care under the MSA.

**B. Duty by Conduct**

Aldridge contends that, even if Cargill did not assume a duty of care under the MSA, it had a duty toward him based on its conduct. KM employees, including Aldridge, regularly used Cargill equipment while working at Cargill's Hammond, Indiana, plant. Based on this, Aldridge contends that, because Cargill provided equipment to assist Aldridge and other KM employees in the past, it should have provided him with equipment to safely move the stove.

Employees of an independent contractor are generally not owed a safe work environment by the entity that hired the independent contractor. *Stumpf*, 863 N.E.2d at 876 (citations omitted). Yet Indiana courts have recognized for decades that a duty of care can arise where one party assumes such a duty (either gratuitously or voluntarily). *See Plan-Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1219 (Ind. Ct. App. 1983)*; Hunt Const. Grp., Inc. v. Garrett*, 964 N.E.2d 222, 225 (Ind. 2012). "The

9

existence and extent of such a duty are ordinarily questions for the trier of fact." *Merrill*, 771 N.E.2d at 1270 (citations omitted). "However, the court will decide the issue as a matter of law when the record contains insufficient evidence to establish such a duty." *Id.* (citations omitted).

In analogous cases, Indiana courts have held that, in order to assume a duty of care, a party must take some affirmative and specific supervisory responsibilities beyond those enumerated in the contract. *See, e.g.*, *Hunt*, 964 N.E.2d at 230 ("We hold that for a construction manager not otherwise obligated by contract to provide jobsite safety to assume a legal duty of care for jobsite-employee safety, the construction manager must undertake specific supervisory responsibilities beyond those set forth in the original construction documents."); *Masick v. McColly Realtors, Inc.*, 858 N.E.2d 682, 692 (Ind. Ct. App. 2006) ("The actor must specifically undertake to perform the task he is charged with having performed negligently, for without actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully.").

The type of supervision contemplated is that of significant safety oversight. For example, in *Robinson v. Kinnick*, the court found that a duty by conduct did not exist because the party alleged to have this duty did not "appoint a safety director . . ., did not hold safety meetings, and did not prescribe any safety precautions . . . ." 548 N.E.2d 1167, 1169 (Ind. Ct. App. 1989). Likewise, in *Smith v. King*, the court explained that "one instance of a safety precaution"—in that case, of covering an opening in the floor with a plywood sheet—did "not raise a jury question as to whether a duty was assumed" by conduct. 902 N.E.2d 878, 883 (Ind. Ct. App. 2009). Rather, the court explained that there must be specific safety oversight such as appointing a safety director, holding safety meetings, prescribing safety precautions, doing daily safety inspections, etc. *Id.* (quoting *Robinson*, 548 N.E.2d at 1169).

Safety oversight alone does not establish a duty by conduct, however. In *Hunt*, Hunt Construction's representatives were actively engaged in safety oversight. *Hunt*, 964 N.E.2d at 231. Yet the court explained that this did not create a duty by conduct because the safety oversight was done under the provisions of the contract and did not go beyond what that document provided for. *Id.*

Cargill did not do safety inspections, hold safety meetings, or anything similar. Indeed, Aldridge does not contend that Cargill took any such actions. Rather, Aldridge's sole contention is that, because he and other KM employees regularly used Cargill equipment, such as forklift trucks, cranes, and a bobcat, as well as safety gear, such as eye and ear protection, it should have given him equipment to move the stove safely. The Court disagrees. Merely providing equipment, even safety equipment, is far from the involved safety oversight required by the cases discussed above. Without evidence that Cargill was actively overseeing the safety of KM employees, a finding of duty by conduct is not warranted. There is no question of material fact on this point. And since Cargill did not owe Aldridge a duty of care, either under the MSA or based on its own conduct, it is entitled to summary judgment.

## V. Conclusion

For these reasons, the Court **GRANTS** Defendant Cargill Incorporated's Motion for Summary Judgment [DE 23] and **DIRECTS** the Clerk of Court to enter judgment against Plaintiff and in favor of Cargill Incorporated.

SO ORDERED this 10th day of April, 2014.

                                        s/ Paul R. Cherry
                                        MAGISTRATE JUDGE PAUL R. CHERRY
                                        UNITED STATES DISTRICT COURT

cc:    All counsel of record

**Appendix – Relevant Portions of the Master Services Agreement**

2. [KM Plant Services] shall be solely responsible for all means, methods, techniques, sequences, and procedures and for coordinating all portions of the Work.

4. Unless otherwise specified in writing, [KM Plant Services] shall provide and pay for all labor, materials, tools, equipment, machinery, transportation, and other facilities and services necessary for the proper execution and completion of the Work.

6. [KM Plant Services] shall comply with all applicable foreign, federal, state and local laws, rules, regulations, codes, ordinances, and orders bearing on the performance of the Work including without limitation those relating to the environment and employee health and safety.

7. It is agreed that [KM Plant Services] is an independent contractor and not an employee, servant, or agent of, or joint venture with, [Cargill], and has no authority to and will not purport to bind [Cargill] to any contract, debt or obligation. All persons used or employed, directly or indirectly, by [KM Plant Services] or any Subcontractor in the performance of the Work (hereinafter collectively referred to "Contractor Employee(s)") shall be deemed to be employees or agents of [KM Plant Services] and not employees or agents of [Cargill]. [KM Plant Services] shall have and exercise exclusive control and direction of Contractor Employees and [KM Plant Services] shall and does warrant that all such persons shall be competent and experienced.

11. [KM Plant Services] and Subcontractor shall perform the Work in a safe and secure manner. [KM Plant Services] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of this Agreement. In furtherance thereof, [KM Plant Services] shall take every reasonable precaution for safety of, and shall provide reasonable protection to prevent damage, injury or loss to (i) persons working on or about the Work (including [Cargill's] employees) and other persons who may be affected thereby; (ii) the Work and the materials and equipment to be incorporated therein, whether in storage, on or off the site, and whether under the care, custody or control of [KM Plant Services] or

[KM Plant Services] shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards

for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities. To the extent possible, [KM Plant Services] shall physically separate the Work site from the remainder of [Cargill's] premises. [KM Plant Services] agrees to periodically inspect the Work site (not less than once a day) for patent and latent defects. [KM Plant Services] further agrees to explicitly warn and notify its employees, and other persons at, in or around the site (including [Cargill's] employees and all guests, visitors, and invitees) of any risks, hazards or peculiar dangers associated with the Work site of which [Cargill] has made [KM Plant Services] aware, or of which [KM Plant Services] is or should be reasonably aware. These responsibilities of [KM Plant Services] shall continue throughout the term hereof and until this Agreement is fully performed by [KM Plant Services].

[KM Plant Services] shall communicate to [its] Employees, regularly enforce, and comply with (i) applicable laws, rules, regulations, codes, ordinances and orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss; and (ii) [Cargill's] safety rules and regulations.

[KM Plant Services] shall designate a responsible member of [KM Plant Services'] organization at the Work site whose duty shall be the prevention of accidents. This person shall be the "Contractor's Superintendent" unless otherwise designated by [KM Plant Services] in writing to [Cargill].

12. [KM Plant Services] is generally discouraged from using [Cargill's] equipment, tools, scaffolding or other materials ("Owner Equipment"). In the event use of Owner Equipment is necessary, [KM Plant Services] agrees to inspect the Owner Equipment and agrees that it will not use same unless it is suitable for the intended use and conforms with any and all applicable laws, rules, regulations, codes, ordinances and orders. [KM Plant Services] assumes full responsibility for the proper use of Owner Equipment and shall return all Owner Equipment to [Cargill] in at least as good condition in which it was borrowed. [KM Plant Services] agrees to release, indemnify, and hold harmless Owner Indemnities from and against any and all claims, damages, demands, liabilities, losses, fines, penalties, costs and expenses (including attorney fees) of whatsoever kind or character arising out of or in any way connected with the use of any Owner Equipment.

Def. Br. Ex. 2 at 7–11.

Exhibit A-1 of the MSA includes another relevant paragraph, entitled "Description of Services":

> Contractor shall provide services to the Hammond, Indiana Cargill location. These services include but our [sic] not limited to Hydro blasting, Industrial Vacuum Services, Hot and Cold Water Pressure Washing, Shuttle Truck Service in Plant, Lawn and Ground Maintenance, Tank Cleaning, Snow Removal, General Labor, as directed by plant personnel, and Sandblasting. These services are to be done on both a scheduled and "Emergency Call-Out" basis.

*Id.* at 4.